IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN FUQUA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 09-3178-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Fuqua seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's depression, anxiety, and right knee pain were not severe impairments; (2) failing to give controlling weight to the opinion of plaintiff's treating physician, Dr. Langguth; (3) assessing plaintiff's residual functional capacity without considering sufficient limitations for plaintiff's chronic obstructive pulmonary disease or considering plaintiff's severe and non-severe impairments in combination; and (4) improperly assessing plaintiff's credibility. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 14, 2006, plaintiff applied for disability benefits alleging that he had been disabled since December 15, 2002. Plaintiff's disability stems from breathing problems; tunnel

vision; back, shoulder, and knee pain; Hepatitis C;[1] depression, and problems using his left hand. Plaintiff's application was denied on June 29, 2006. On August 5, 2008, a hearing was held before an Administrative Law Judge. On August 27, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 22, 2009, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99

---

[1]Hepatitis C is an infection caused by a virus that attacks the liver and leads to inflammation. Most people infected with the hepatitis C virus have no symptoms. In fact, most people do not know they have the hepatitis C infection until liver damage shows up, decades later, during routine medical tests. www.mayoclinic.com.

(1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV.    *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert, George Horne, in addition to documentary evidence admitted at the hearing.

## A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1976 through 2008:

    1976 TOTAL                  $    3,622.00

| | | |
|---|---|---|
| 1977 TOTAL | $ | 2,873.75 |
| 1978 TOTAL | $ | 0.00 |
| 1979 TOTAL | $ | 3,166.92 |
| 1980 TOTAL | $ | 2,328.10 |
| 1981 TOTAL | $ | 4,038.74 |
| 1982 TOTAL | $ | 0.00 |
| 1983 TOTAL | $ | 2,641.55 |
| 1984 TOTAL | $ | 6,025.10 |
| 1985 TOTAL | $ | 0.00 |
| 1986 TOTAL | $ | 0.00 |
| 1987 TOTAL | $ | 0.00 |
| 1988 TOTAL | $ | 0.00 |
| 1989 TOTAL | $ | 0.00 |
| Interim Personnel, Inc. | $ | 503.63 |
| Dale Babij Construction, Inc. | | 746.25 |
| AM West Ventures, Inc. | | 101.12 |
| Alpha Personnel Services | $ | 1,978.00 |
| 1990 TOTAL | $ | 3,329.00 |
| Sunview Development Corp. | $ | 2,187.50 |
| 1991 TOTAL | $ | 2,187.50 |
| Interim Personnel, Inc. | $ | 7,896.45 |
| 1992 TOTAL | $ | 7,896.45 |
| Estates Landscaping | $ | 56.00 |
| American Alliance Always Available | $ | 7,418.87 |
| 1993 TOTAL | $ | 7,474.87 |

| | | |
|---|---|---|
| American Alliance Always Available | $ | 7,543.30 |
| 1994 TOTAL | $ | 7,543.30 |
| American Alliance Always Available | $ | 1,981.34 |
| 1995 TOTAL | $ | 1,981.34 |
| 1996 TOTAL | $ | 0.00 |
| Roseville Personnel Services | $ | 199.00 |
| 1997 TOTAL | $ | 199.00 |
| Sierra Sunrise Construction | $ | 200.00 |
| Alta Pacific Landscape | | 3,815.10 |
| Justin Framing, Inc. | $ | 548.00 |
| 1998 TOTAL | $ | 4,563.10 |
| Alpha Staffing, Inc. | $ | 696.50 |
| Harringtons Construction | $ | 140.00 |
| 1999 TOTAL | $ | 836.50 |
| 2000 TOTAL | $ | 0.00 |
| 2001 TOTAL | $ | 0.00 |
| 2002 TOTAL | $ | 0.00 |
| 2003 TOTAL | $ | 0.00 |
| 2004 TOTAL | $ | 0.00 |
| 2005 TOTAL | $ | 0.00 |
| 2006 TOTAL | $ | 0.00 |
| 2007 TOTAL | $ | 0.00 |
| 2008 TOTAL | $ | 0.00 |

(Tr. at 93-95, 105-107, 111).

**Function Report**

In a Function Report dated February 27, 2006, plaintiff reported that he takes his morning medicine and watches television until it is time to take his evening medicine and go to bed (Tr. at 130). He sleeps 11 to 13 hours per day (Tr. at 130). Plaintiff reported in the same document that he suffers from insomnia and cannot sleep without medication (Tr. at 131).

Plaintiff reported no problems with any aspect of personal care (Tr. at 131). He reported that he does not prepare his own meals, but he can prepare snacks each day (Tr. at 132). His mother cooked once per day (Tr. at 132). Plaintiff was able to mow the lawn using a riding lawn mower and he sometimes would take out the trash (Tr. at 132). He breathes hard and gets dizzy doing most any activity (Tr. at 132).

Plaintiff reported that he is able to go out alone (Tr. at 133). However, he does not go out much in the winter because cold weather makes his back and joints hurt (Tr. at 133). He reported that he does not drive, but when asked to explain why not, plaintiff left that part of the form blank (Tr. at 133). Plaintiff wrote that he is able to shop in stores for food twice a month for about one hour at a time (Tr. at 133).

Plaintiff was asked to circle each activity that is affected by his condition (Tr. at 135). He circled lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, stair climbing, memory, completing tasks, concentration, and using his hands (Tr. at 135). He did not circle sitting, understanding, following instructions, or getting along with others (Tr. at 135). Next to talking, plaintiff wrote a question mark (Tr. at 135). Next to seeing plaintiff wrote a question mark and then wrote "glasses" (Tr. at 135).

He was asked if he could finish what he starts, and he checked "yes" (Tr. at 135).

**Disability Report**

In an undated Disability Report plaintiff reported that the conditions which limit his ability to work are Hepatitis C, emphysema, arthritis, heart problems, and depression (Tr. at 139). He reported that his condition first bothered him on December 15, 2002; that his condition first prevented him from working on December 15, 2002; and that he last worked on January 31, 1999 (Tr. at 139).

**B.       SUMMARY OF MEDICAL RECORDS**

December 15, 2002, is plaintiff's alleged onset of disability.

On January 22, 2003, plaintiff was seen at the Shasta Community Health Center as a new patient (Tr. at 285-286). "He comes in with the problem that six or so weeks ago he got a nail in the thenar eminence of his left hand. He ended up getting a tetanus shot and put on some type of antibiotic. It was quite swollen. He later got a boil below the left ear, so there was some contamination throughout his system and he has had a terrible cough now for quite some period of time. He is a tobacco user, but he is producing a cough with green mucus. He just feels [run] down and sickly, like he never quite got over the infection brought on by the hand wound." Plaintiff weighed 176 pounds, his blood pressure was 120/88, his pulse was 78 and regular. No wheezing was heard, although plaintiff reported wheezes at night. He had a mucousy sound in the left lower lobe. He was assessed with bronchitis and was given a 14-day sample of erythromycin, an antibiotic, and an Advair inhaler. "Return to clinic if he is not improving, but this should certainly cleanse his system." The record was signed by E. Houston, FNP (family nurse practitioner) and A. Demoraes, M.D.

On January 31, 2003, plaintiff was seen at the Shasta Community Health Center by Dr. John Hall for a follow up on an upper respiratory infection (Tr. at 284). Plaintiff was listed as a smoker. He complained of fevers, chills, and feeling "spacy." He denied shortness of breath. He said he had joint pain, chest pain, and weak hands. "Wants Vicodin [narcotic] for pain. Wants Trazodone [antidepressant] for sleep." He was observed to have a hoarse voice due to an injury "12 years ago". Plaintiff was assessed with improving bronchitis, myalgias/arthralgias (muscle pain/joint pain), and insomnia. Dr. Hall prescribed Naprosyn (a non-steroidal anti-inflammatory) with a notation "No Narcotics", and he was given a prescription for Trazodone.

On February 13, 2003, plaintiff was seen at the Shasta Community Health Center for "blood test results" (Tr. at 275-276). Plaintiff had elevated SGOT and SGPT (liver function tests), otherwise normal. "He says he has a lot of joint pain and I suspect he is hepatitis C positive. He also noted when he gets up out of a chair at a rapid rate has a little gray-out sensation. It is very possible he had a heart attack six years ago. He went to a hospital after experiencing chest pain but signed himself out AMA [against medical advice]. They tried to contact him afterwards to come back, and I do suspect he had a mild heart attack." Plaintiff's blood pressure was 118/70, pulse was 82 and regular. "Heart is regular. EKG is abnormal with lower ST segments. He also has a left bundle branch block.[2] He does not have chest pain now.

_____

[2]The heart's electrical impulse originates in the sinus node in the upper right atrium, then spreads across both atria, then travels through the AV node. Leaving the AV node, the electrical impulse penetrates into the ventricles via the His bundle. From the His bundle, the electrical impulse enters the two "bundle branches," the right and the left. (The His bundle with the two bundle branches are shaped like a wishbone -- the His bundle being the single part of the bone and the bundle branches being the two ends of the wishbone), with the AV node at the top of the His bundle. The two bundle branches extend into each of the ventricles. The right and left bundle branches send the electrical impulse to the right and left ventricle, respectively. When the

Lungs are clear." Plaintiff reported smoking 1/2 pack of cigarettes per day. Plaintiff was assessed with elevated liver enzymes and "some gray-out sensation when he stands up quickly." "As soon as he gets proof of Medi-Cal [California State Medicaid] we will do a hepatitis panel, a cholesterol panel, and refer him to Cardiology. I also filled out welfare medical release form for him and it [sic] put it down between 2/13/03 and 5/13/03. He is out of work. I directed the patient to take one aspirin a day and eat an extremely low fat diet."

On February 24, 2003, plaintiff was seen at the Shasta Community Health Center (Tr. at 273-274). "45-year-old who wants to be referred to a cardiologist. He thinks six to eight years ago he had a heart attack, left the hospital AMA [against medical advice], and never found out for sure. They were doing a bunch of tests on him and wanted to keep him so I suspect he may have. He also is concerned about elevated liver functions. We are going to do a hepatitis panel. He did some risky behavior earlier in his life. Shortness of breath secondary to COPD [chronic obstructive pulmonary disease] secondary to tobacco abuse. He doesn't have what one would call frank chest pain but he does have discomfort in the heart and if he exerts himself it is

_____

bundle branches are functioning normally, the right and left ventricles contract nearly simultaneously. Bundle branch block occurs when one of the bundle branches becomes diseased or damaged and stops conducting electrical impulses; that is, a bundle branch becomes "blocked." The chief effect of a bundle branch block is to disrupt the normal, coordinated and simultaneous distribution of the electrical signal to the two ventricles. In left bundle branch block, the left bundle branch no longer conducts electricity. Therefore, as the electrical impulse leaves the His bundle, it enters the right bundle branch only and is carried to the right ventricle. Then, from the right ventricle, the electrical impulse finally makes its way to the left ventricle. As a result, the two ventricles no longer receive the electrical impulse simultaneously. First the right ventricle receives the electrical impulse, then the left. Left bundle branch block usually indicates underlying cardiac pathology. It is seen in dilated cardiomyopathy (weakened and enlarged heart), hypertrophic cardiomyopathy (thickening of the heart muscle), hypertension (high blood pressure), aortic valve disease, coronary artery disease, and a variety of other cardiac conditions.

worse." Plaintiff's blood pressure was 126/80, his pulse was 84, and he reported smoking 1/2 pack of cigarettes per day. Plaintiff's lungs had reduced breath sounds but were otherwise clear. His heart had a regular rate and rhythm without murmurs, heaves, thumps, or gallops. "He moves about the office with aches and pains but no impairment in the chest and there are no signs of chest wall pain." He was assessed with elevated liver functions, chest pain, tobacco abuse, and COPD. The doctor ordered a hepatitis panel and referred plaintiff to Dr. Ditchey for evaluation. "We have an old EKG which is abnormal, and I will send a copy of that." Plaintiff was prescribed Vicodin (narcotic) for pain and Trazodone (antidepressant) for sleep. The note was signed by Everett Houston, nurse practitioner, and Alex Demoraes, M.D.

On April 1, 2003, plaintiff was seen at the Shasta Community Health Center to get the results of lab work (Tr. at 263, 266). His lipid panel (cholesterol and triglycerides) was excellent, his glucose (sugar) was slightly elevated but A1c (three-month average blood sugar) was normal, uric acid was normal, thyroid was slightly low, rheumatoid factor was positive "but it is probably a false positive secondary to hepatitis C". Plaintiff had elevated liver function "a test before" with SGOT of 50 (normal is 5 to 40) and SGPT of 104 (normal is 7 to 56). Plaintiff had been exposed to Hepatitis C a few years earlier. "Patient also complains of those things which would be realistic in hepatitis C, joint pain, arthritis-like syndrome. He has been a hard-working man in the past, doing a lot of landscaping. Now, everything seems to hurt when he moves." Plaintiff's blood pressure was 140/90, pulse was 70. He was prescribed Synthroid, a thyroid hormone substitute, and was told to attend a Hepatitis C movie. Plaintiff was coughing, so a chest x-ray was done which was "within normal limits." The form was signed by Everett Houston, a nurse practitioner, and Alex Demoraes, M.D.

On April 7, 2003, plaintiff was seen at the Shasta Community Health Center (Tr. at 259-260). Plaintiff's blood pressure was 160/80, his pulse was 80, and he was smoking a pack of cigarettes per day. "This 45-year-old gentleman has been having reactions to his medicines. This time it was probably the thyroid. He gets very nervous. While he is not allergic to any of these things, he thinks he is and then gets upset about it." Plaintiff's weight was 185, his blood pressure was 160/80, his pulse was 80 and regular. "He has poor sleep. He takes trazodone which is only somewhat helpful. It was more helpful in the past but not now. His thyroid is low. He is taking Synthroid, this shouldn't cause any problems. Vicodin made him ill with a GI upset. He has tons of family problems which is causing all this." Plaintiff was assessed with anxiety/depression and poor sleep pattern. He was told to continue the Trazodone and the Synthroid. He was prescribed Seroquel (antipsychotic) for sleep. He was prescribed Prozac (antidepressant) and was prescribed Ativan (treats anxiety) twice a day with one refill to "see if this won't calm him down enough to let the other medicines to their job." The note was signed by Everett Houston, a nurse practitioner, and Alex Demoraes, M.D.

On April 11, 2009, a form letter was signed by Marie Roberts at Shasta Community Health Center in Redding, California (Tr. at 258). The letter states that plaintiff "was referred to view the Hepatitis C video, and scheduled on 4/11/03. The appointment was not kept, and the patient did not call to confirm or cancel the appointment. I will be happy to reschedule the patient if you feel the appointment is critical for his/her health. Please indicate below your preference for this patient." The letter is addressed to E. Houston, a nurse practitioner. At the bottom of the form, the selection "do not refer" is checked, but the signature is illegible.

On April 14, 2003, plaintiff was seen at the Shasta Community Health Center (Tr. at 256-257).  He was "just checking back on his insomnia and he is doing well with Seroquel and trazodone.  With his anxiety and depression he is doing somewhat better with Prozac and Ativan."  Plaintiff's weight was 189, his blood pressure was 128/80, he was smoking a pack of cigarettes per day.  "The patient seems a great deal calmer to me but he says he thinks he is only a little bit better."  He was assessed with insomnia and anxiety/depression.  He was told to continue with his medications.  It was noted that plaintiff would be seeing a heart specialist the following week due to an abnormal EKG.  This note was signed by Everett Houston, a nurse practitioner, and Alex Demoraes, M.D.

On April 18, 2003, plaintiff was seen by Roy Ditchey, M.D., a cardiologist, due to abnormal electrodcardiogram and chest pain (Tr. at 292-294).  Dr. Ditchey's record reads in part as follows:

> HISTORY:  John Fuqua is a 45 year-old man who reportedly had a heart attack in 1992 for which he was seen in an emergency room in Sacramento.  He is not sure what hospital and recalls only waking up in the ambulance with a person doing CPR.  He apparently left against medical advice and describes having been contacted subsequently and advised to come back to the hospital because of evidence of a heart attack.  He subsequently generally did well and was physically active without cardiac symptoms.
>
> Last December he reportedly developed pneumonia and apparently has had ongoing problems wince that time, including some exertional dyspnea [shortness of breath], pains in his shoulders, back and neck.  Abnormal liver function tests were recently determined to show hepatitis C.  In addition to his shoulder pains, he reports having had chest pain in association with pneumonia occurring with cough and inspiration [breathing in].  He denies exertional chest pain suggestive of angina.  There is no history of orthopnea,[3]

---

[3]The inability to breathe easily unless one is sitting up straight or standing erect.

paroxysmal nocturnal dyspnea,[4] or edema.[5]

Over the months, he has had frequent episodes of a pounding sensation in his chest that is sometimes irregular, but not particularly rapid. He describes the palpitations as gradual in onset and termination lasting from minutes to hours. He had a long episode about ten days ago for which he was seen in the emergency room at Redding Medical Center and released. He describes having been told that he had a residual viral infection in his lungs at that time and also possibly had a reaction to Vicodin. He apparently fainted twice while sick with pneumonia. Both episodes were postural in nature. There is no history of heart murmur.

CORONARY ARTERY DISEASE RISK FACTORS: He has smoked 1 PPD [pack per day] for thirty years. There is no history of hyperlipidemia, diabetes, or hypertension. A paternal uncle had a heart attack in his 60's. . . .

PAST MEDICAL HISTORY: Possible myocardial infarction [heart attack], chronic obstructive lung disease, hypothyroidism, hepatitis C, elevated rheumatoid factor, pneumonia, anxiety, nephrolithiasis [kidney stones], traumas with multiple fractures including rib, finger, and nose, exploratory laparotomy,[6] and gunshot wounds. He quit drinking heavily about ten years ago. He has used methamphetamine in the past, but not recently. There is no history of vein stripping, claudication,[7] stroke, or rheumatic fever.[8] . . .

After conducting lab work (which was all normal) and a physical examination, Dr. Ditchey

assessed the following:

    (1)    History of myocardial infarction (undocumented).

---

[4]A sensation of shortness of breath that awakens the patient and is usually relieved in the upright position.

[5]Swelling caused by fluid in body tissues.

[6]A laparotomy is a large incision made into the abdomen. Exploratory laparotomy is used to visualize and examine the structures inside of the abdominal cavity.

[7]Claudication is pain and/or cramping in the lower leg due to inadequate blood flow to the muscles.

[8]Rheumatic fever is an inflammatory disease that may develop after an infection with Streptococcus bacteria (such as strep throat or scarlet fever). The disease can affect the heart, joints, skin, and brain and is responsible for many cases of damaged heart valves.

(2)     Left bundle branch block.[9]

(3)     Atypical chest pain.

(4)     Exertional dyspnea [shortness of breath on exertion].

(5)     Palpitations.

(6)     Heart murmur.[10]

(7)     Other problems as described above.

RECOMMENDATIONS:  The patient is not certain where he was evaluated for his reported heart attack in Sacramento and records are not available.  He subsequently did well and I am skeptical that he actually had a heart attack.  His current electrocardiographic abnormalities are due to left bundle branch block.  I suspect his dyspnea is pulmonary in etiology, and he has no clear ischemic[11] symptoms.  However, he does have a murmur and I decided to get an echocardiogram to assess his murmur, ventricular function, and regional wall motion.  I will also get an exercise perfusion scan to further evaluate the possibility of coronary disease.  I decided against further evaluation of his palpitations at this point but I will discuss this with him again at his next visit.  I emphasized the importance of smoking cessation. . . .

On April 24, 2003, a note from Shasta Community Health Center in Redding, California, was typed which reads as follows:  "S:  This is a 45-year old gentleman here for work release so he doesn't have to work because of his arthritis, aches and pains and hepatitis C.  He saw Dr. Ditchery, is going in for an echo and treadmill.  He does have some instability of his heart and I don't know what it is yet.  I guess they don't either.  He is probably moving to Missouri shortly so that may stop those particular investigations.  I will fill this out until 10/24/03. A:  1.  Multiple

---

[9]See footnote 2 on page 9.

[10]A heart murmur is an extra or unusual sound heard during a heartbeat.

[11]Ischemia is a decrease in the blood supply to an organ usually caused by obstruction of the blood vessels.

15

problems; see chart. Food stamps until 10/24/03." (Tr. at 254). The note was signed by Everett Houston, F.N.P. (family nurse practitioner) and Alex Demoraes, M.D.

On May 6, 2003, plaintiff was seen by Roy Ditchey, M.D., for an echocardiogram[12] (Tr. at 290). The impressions were listed as follows:

      1.      Mild to moderate left ventricular systolic dysfunction[13] with septal hypokinesis,[14] possible mild diffuse hypokinesis,[15] and possible diastolic dysfunction.[16]

      2.      Borderline ascending aortic dilatation.[17]

      3.      No significant valvular abnormalities.

On May 9, 2003, a form letter was signed by Marie Roberts at Shasta Community Health Center in Redding, California (Tr. at 252). The letter states that plaintiff "was referred to view

---

[12]An echocardiogram is a test that uses sound waves to create a moving picture of the heart. The picture is much more detailed than a plain x-ray image and involves no radiation exposure.

[13]Left ventricular systolic dysfunction is the condition where the left ventricle can only manage to eject less than 40% (occasionally less than 35%) of the blood in it, with each contraction. A normal ejection fraction is 55 to 70%.

[14]Diminished or abnormally slow movement in the wall separating the two sides of the heart.

[15]Diminished or abnormally slow movement in all of the walls of the heart.

[16]Diastolic dysfunction occurs when the ventricles (the lower chambers) of the heart become relatively "stiff," and thus it becomes relatively difficult to fill the ventricles with blood in between heart beats.

[17]A "borderline" dilated ascending aorta. The ascending aorta is the first section of the aorta, the largest artery in the body. The ascending aorta starts from the left ventricle of the heart and extends to the arch (the bend) of the aorta. The right and left coronary arteries that supply blood to the heart muscle arise from the ascending aorta. The ascending aorta is an arbitrary anatomic entity because the aorta is one continuous conduit that stems from the left ventricle of the heart to carry blood to most of the body. The ascending aorta is, however, a convenient division of the aorta.

the Hepatitis C video, and came to the clinic on 5/9/03.  S/he will be placed in the waiting list to be seen by the gastroenterology group."  The letter is addressed to E. Houston, a nurse practitioner.

On October 22, 2003, plaintiff was seen at Buffalo Medical Center (Tr. at 240).  Plaintiff had been out of his medication.  He said he had an electrical problem, congestion and cough for the past two to three days, and trouble sleeping.

Plaintiff's gait was normal.  He was assessed with palpitations and told to repeat an EKG or Holter monitor.  Prescriptions were written for Seroquel (antipsychotic), Prozac (antidepressant), Trazodone (antidepressant), Levoxyl (replacement thyroid hormone), and a Holter monitor.

On October 24, 2003, plaintiff was seen at Buffalo Medical Center (Tr. at 239).  He complained of vision problems.  The record notes plaintiff as a "heavy smoker" and says that he was "applying for SSI".  He was assessed with vision changes and Hepatitis C.  Plaintiff was fitted with a Holter monitor (Tr. at 250) which he wore for 24 hours.  Plaintiff's average heart rate was 74 beats per minute.  He had no prolonged sinus pause or evidence of advanced AV block.  He had one episode of bradycardia (low heart rate) at 45 beats per minute and one episode of sinus tachycardia at 126 beats per minute.  He had no supraventricular tachycardia.  Plaintiff's activity diary indicated he had symptoms of "heart feels funny, heart beating funny, heart pounding, can't take full breath" however, "[t]he patients symptoms did not correlate with any cardiac dysrhythmia."

On November 14, 2003, plaintiff had liver function tests done. His SGPT/ALT[18] was high at 108 (normal is 21-72).

On November 18, 2003, plaintiff was seen at the Buffalo Eye Clinic (Tr. at 242-243). Plaintiff had been using over-the-counter reading glasses. The records are largely illegible. The plan includes Suggest BF which I surmise could be "bifocals"; however, that is not clear.

On January 6, 2004, plaintiff saw Eric Davis, D.O., to establish care (Tr. at 301-302, 306). He complained of shortness of breath with exertion which had gotten worse over the past eight to nine months. Plaintiff said he had pneumonia about a year earlier and felt he had never recovered. Plaintiff continued to smoke a half a pack of cigarettes per day. Plaintiff reported arthritis of the spine and said he had taken non-steroidal anti-inflammatories such as Celebrex, Naprosyn, and over-the-counter Ibuprofen without success. He had taken Vicodin (narcotic) and Ativan (for anxiety) which he reported to be somewhat effective. Plaintiff was currently taking Relafen (non-steroidal anti-inflammatory) which was not helping. On exam plaintiff's vital signs were stable, he was alert and oriented, judgement and insight were appropriate, mood and effect were stable. His heart had a regular rate and rhythm without murmurs. His lungs had some decreased breath sounds bilaterally with mild rhonchi (sounds that resemble snoring) in the upper lung fields. Pulmonary function tests done in the office revealed a moderate restriction with an estimated lung age of 83.7 years. X-rays of the chest showed increased bronchial

---

[18]Serum glutamic pyruvic transaminase is an enzyme that is normally present in liver and heart cells. SGPT is released into blood when the liver or heart is damaged. The blood SGPT levels are thus elevated with liver damage (for example, from viral hepatitis) or with an insult to the heart (for example, from a heart attack). Some medications can also raise SGPT levels, also called alanine aminotransferase (ALT).

markings and mild emphysema[19] type changes.  Dr. Davis assessed shortness of breath secondary to emphysema and years of tobacco use, foreign body to the left foot (plaintiff had previously been shot in the foot by a nail gun), hypothyroidism, mild to moderate depression, and "low back pain and history of arthritis per patient."  "A long discussion was undertaken regarding patient's diagnosis of emphysema and pulmonary function tests results.  I informed him that he needs to be on some type of maintenance inhaler to help reduce inflammation in the lung tissue.  I also informed the patient that it is imperative for him to have a pneumonia shot at least every 5-7 years and a yearly influenza vaccination."  Plaintiff was given samples of Advair inhalers.  He was given a prescription for Combivent inhaler and Ultram.  He was told that he could continue to use the Relafen.

On January 20, 2004, plaintiff had pulmonary function tests done at St. John's Regional Health Center (Tr. at 245-248).  The first test revealed a FVC of 2.78, or 57 percent of predicted. The FEV1 measured 2.49, or 63 percent of predicted.

---

[19]Normally functioning lungs are elastic, efficiently expanding and recoiling as air passes freely through the bronchus to the alveoli (air sacs), where oxygen is moved into the blood and carbon dioxide is filtered out.  When a person inhales cigarette smoke or certain other irritants, his or her immune system responds by releasing substances that are meant to defend the lungs against the smoke.  These substances can also attack the cells of the lungs, but the body normally inhibits such action with the release of other substances.  In smokers and those with the inherited defect, however, no such prevention occurs and the lung tissue is damaged in such a way that it loses its elasticity.  The small passageways (bronchioles) leading to the alveoli collapse, trapping air within the alveoli.  The alveoli, unable to recoil efficiently and move the air out, over expand and rupture.  As the disease progresses, coughing and shortness of breath occur.  In the later stages, the lungs cannot supply enough oxygen to the blood.  Emphysema often occurs with other respiratory diseases, particularly chronic bronchitis.  These two diseases are often referred to as one disorder called chronic obstructive pulmonary disease.

On January 22, 2004, plaintiff had the foreign body removed from his foot (Tr. at 303). This was due to having been shot in the foot with a nail gun.

On March 1, 2004, plaintiff saw Dr. Davis for a follow up on emphysema and use of Advair (Tr. at 300, 305). Plaintiff continued to have some low back pain and right knee pain and swelling. He twisted his knee about a week earlier and said he had injured his knee about 20 years ago. Plaintiff was using Ultram which was moderately helpful for his low back pain. "Vital signs are stable. In general patient is alert and oriented and in no acute distress. Heart is regular rate and rhythm, without murmurs. Lungs with better air movement today when compared to 01-05-04. Pulmonary function test in office revealed mild restriction with improvement of estimated lung age of 67.4 years. Musculoskeletal exam: The right knee does demonstrate some minimal joint line tenderness and swelling noted. Ligaments appear intact." Dr. Davis assessed right knee pain and swelling with possible instability, improving emphysema, and low back pain. Plaintiff was told to take Ibuprofen along with Ultram, to use the Advair twice a day regardless of how he feels, and he was told to get an MRI of his knee.

On March 4, 2004, plaintiff had an MRI of his right knee (Tr. at 311). Bryan Hall, M.D., found "small knee joint effusion[20] as well as a patella [knee cap] that is somewhat subluxed [dislocated] laterally relative to the patellofemoral groove, but the exam is otherwise negative with no internal derangement [abnormality]."

---

[20]A small amount of fluid exists in normal joints. When a joint is affected by arthritis, particularly an inflammatory arthritis such as rheumatoid arthritis, increased abnormal amounts of fluid build up and the knee appears swollen. The fluid is produced by the tissues that are affected by the arthritis and that line the joint. This condition is called effusion, also known as "water on the knee."

On November 18, 2004, plaintiff was seen at Dallas County Family Medical Center (Tr. at 230). He complained of intermittent episodes of his heart racing, lasting for several minutes. He reported that he had a Holter monitor the previous year and was diagnosed with a bundle branch block.[21] Plaintiff also reported a history of chronic pain in the left side of his neck. On exam everything was normal. He was assessed with paroxysmal supraventricular tachycardia ("PSVT"), which means occasional rapid heart rate, and chronic neck pain. He was told to continue his current medication (Ultram, a narcotic-like pain reliever). In addition, the doctor prescribed Toprol XL, a beta blocker.

On January 19, 2005, plaintiff was seen at Dallas County Family Medical Center (Tr. at 229). Plaintiff reported that he was feeling OK except he had episodes of heart racing in the evenings, none in the morning. His lungs were normal, breathing was normal, heart sounds were normal, extremities were normal. He was diagnosed with PSVT and hypertension. He was prescribed Toprol XL, a beta blocker.

On February 1, 2005, Dr. Davis's notes reflect that plaintiff had been incarcerated since October 2004 (Tr. at 304). Someone in Dr. Davis's office called the Dallas County Sheriff's Department and was told that plaintiff had been getting all of his medication, care, and labs from Dr. Spurlock. "Dr. Briden will continue to follow during incarceration."

On March 7, 2005, the Wilkinsons Pharmacy called the Buffalo Family Health Center (Tr. at 299, 304). Most of the record is not legible, but it does say "pt. remains incarcerated".

---

[21]See footnote 2 on page 9.

On March 24, 2005, plaintiff was seen at Dallas County Family Medical Center (Tr. at 228). Plaintiff complained of congestion, shortness of breath, nonproductive cough, acid reflux, and chronic obstructive pulmonary disease. Plaintiff was well nourished, well developed, alert and oriented times three, and in no acute distress. Plaintiff's eyes, ears, neck, respiratory effort, auscultation (listening with a stethoscope) of lungs, and heart were all normal. He was assessed with bronchitis and gastroesophageal reflux disease. He was given Bactrim (antibiotic) and Prilosec (for stomach acid).

On April 26, 2005, plaintiff's mother called Buffalo Family Health Care (Tr. at 299). She said plaintiff had been staying with her since his release from jail, that he did not get his medication from the jail, and that he was without insurance at the time. Plaintiff's mom requested prescriptions for plaintiff's medications be faxed to a pharmacy. The clinic explained to plaintiff's mother that plaintiff had to be seen before medication could be prescribed.

On May 17, 2005, plaintiff saw Dr. Davis (Tr. at 297-298). Plaintiff needed medication refills. He had been out and received a seven-day supply from Urgent Care. Plaintiff complained of feeling very anxious and nervous which had gotten worse over the past several months. Plaintiff had taken his Ativan more often than directed. He reported having trouble sleeping, for which he was taking Seroquel and Trazodone. "Patient also has some paranoid sensations and feeling especially about cops." Plaintiff said he was told he has arthritis in all of his joints. He reported drinking beer on occasions, smoking a half pack of cigarettes per day, and a past history of smoking marijuana. On exam, plaintiff's vital signs were stable, he was alert and oriented and in no acute distress, judgment and insight were appropriate, mood and effect were stable, heart had a regular rate and rhythm without murmurs, his lungs were clear to

22

auscultation bilaterally with some moderate decreased breath sounds toward the bases.  Dr. Davis assessed increased stress and anxiety, paranoia most likely secondary to schizophrenia component, emphysema, and diffuse joint pain "according to the patient."  Plaintiff was told to take Seroquel at bedtime to help with sleep, his Prozac was restarted, he was old to stay off the Ativan as much as possible.  He was given samples of Durabac for pain.

On May 19, 2005,[22] the Missouri Department of Social Services completed a Medical Report Including Physician's Certification/Disability Evaluation (Tr. at 224-225).  This was completed by non-treating physician Dr. Charles Mauldin.  Chief complaint was, "Says he can't work since he got pneumonia 3 yr ago because he can't breathe and his heart goes crazy.  Has to rest after walking 1/2 block - out of breath believes he has emphysema (but smokes) and bundle branch block".  Plaintiff weighed 229 pounds.  He could hear normal conversation from eight feet in his right ear and ten feet in his left ear with 20 feet being normal.  Plaintiff's cardiac exam was normal, his lungs were clear and the notes say "<u>not</u> barrel chested."  Plaintiff's speech was normal except he spoke in a whisper.  His bones, joints, and extremities were normal except he had stiffness in his left middle finger and "give way" weakness in both arms.  The notes say, "✳walks about a block - briskly - and acts short of breath but pulse, blood pressure and oxygen level (by pulse oximetry) are **<u>unchanged</u>**." (emphasis in original).  Primary diagnoses included history of multiple trauma and arthritis, history of emphysema, history of hypothroidism.  Secondary diagnoses included anxiety/depression/insomnia and Hepatitis C.  In the section titled "Summarize findings with emphasis on functional capacity, the doctor wrote, "No functional

_____

[22]The front page of the form is dated May 19, 2005, while the second page of the form is dated February 25, 2005.

impairment discovered (evidence of embellishment is)." The doctor found that plaintiff did not have a mental or physical disability.

On August 19, 2005, plaintiff saw Steven Langguth, M.D. (Tr. at 177). Plaintiff reported that he had been diagnosed with emphysema and that he was hit by a truck ten plus years ago requiring liver repair. Plaintiff complained of diffuse joint pain and stiffness. He said he recently lost his Medicaid and needed to get medication. The diagnosis appears to be two words long but is illegible. Dr. Langguth prescribed Combivent inhaler, Advair (inhaler), Prilosec (reduces stomach acid), Toprol XL (beta blocker), Seroquel (antipsychotic), Feldene (non-steroidal anti-inflammatory), and several other illegible medications. There is no indication that any exam was done during this visit.

On September 9, 2005, plaintiff saw Dr. Langguth (Tr. at 176). Plaintiff reported that he checks his blood pressure at home, and many mornings it is around 150/110. Dr. Langguth prescribed Toprol XL.

On September 30, 2005, plaintiff saw Dr. Langguth (Tr. at 175). The notes indicate that plaintiff was to discontinue his Lodine (non-steroidal anti-inflammatory) and instead start taking Mobic (non-steroidal anti-inflammatory). Plaintiff's other medications were refilled.

On October 28, 2005, plaintiff saw Dr. Langguth and complained of pain adjacent to the right side of his spine and just below his right scapula. He stated that he had had this pain for a few weeks and it had gotten worse over the past few days. Dr. Langguth prescribed Flexeril, a muscle relaxer. He refilled plaintiff's Mobic (non-steroidal anti-inflammatory), Toprol XL, Advair (inhaler), and some other illegible medication.

On November 21, 2005, plaintiff saw Dr. Langguth (Tr. at 173). The record says, "No new problems, needs meds." He assessed hypertension (plaintiff's blood pressure was 120/80), chronic obstructive pulmonary disease, esophageal reflux, hypothyroidism, and backache. He told plaintiff to continue his current medications and come back in a month.

On December 20, 2005, plaintiff saw Dr. Langguth complaining that he fell a few days ago and broke his rib (Tr. at 172). On exam plaintiff's chest was normal. Dr. Langguth assessed hypertension, chronic obstructive pulmonary disease, backache and depression. He did not order x-rays or assess broken or bruised ribs. He refilled plaintiff's Advair (steroid inhaler). The note says, "Patient receiving Toprol [beta blocker used to treat circulatory conditions], Synthroid [replacement thyroid hormone], Combivent [inhaler], Mobic [non-steroidal anti-inflammatory] through PAP [Pharmaceutical Assistance Program]."

On January 17, 2006, plaintiff saw Dr. Langguth to get refills on his medications (Tr. at 171). The record says, "Doing well. Needs meds." Dr. Langguth assessed hypertension, chronic obstructive pulmonary disease, hypothydroidism, arthritis, and depression. He told plaintiff to continue on his current medications and come back in three months. Dr. Langguth refilled the following prescriptions: Ascriptin Enteric (aspirin), Cyclobenzaprine (muscle relaxer), Omeprazole (reduces stomach acid), Trazodone (an antidepressant also used as a sleep aid), Vicodin (narcotic pain reliever), and Seroquel (antipsychotic).

On February 17, 2006, plaintiff saw Dr. Langguth complaining of productive cough for the past two weeks (Tr. at 170). Dr. Langguth assessed acute bronchitis and prescribed Ketek (antibiotic), dispensing 20 tablets. He told plaintiff to increase his fluids and follow up as needed.

On February 21, 2006, plaintiff saw Dr. Langguth complaining of continued cough (Tr. at 169). Dr. Langguth assessed acute bronchitis. He ordered a chest x-ray, told plaintiff to take Robitussin-AC (cough suppressant with codeine, a narcotic), and return as needed.

On March 31, 2006, plaintiff saw Dr. Langguth with a chief complaint of prescription refills and results of x-rays (Tr. at 215). Plaintiff's weight was 257 pounds. No exam was done. Dr. Langguth assessed chronic obstructive pulmonary disease, esophageal reflux, backache and primary insomnia. He told plaintiff to continue his current medications. He prescribed aspirin and cyclobenzaprine (muscle relaxer) with two refills.

On April 10, 2006, Alan Aram, Psy.D., completed a Psychiatric Review Technique (Tr. at 180-193). Dr. Aram found that plaintiff's mental impairment is not severe. He found that plaintiff suffers from depressive syndrome characterized by sleep disturbance, psychomotor agitation or retardation, decreased energy, and feelings of guilt or worthlessness. He found that plaintiff's condition resulted in no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support of these findings, Dr. Aram cited plaintiff's Function Report, Dr. Langguth's records which are totally related to physical problems with no mention of the severity of any of plaintiff's mental symptoms, the lack of any counseling, and a minimal work history including quitting work four years before his alleged onset of disability.

On May 12, 2006, plaintiff was examined by Aaron Lewis, M.D., in connection with his disability application (Tr. at 194-199). Plaintiff had alleged Hepatitis C, emphysema, arthritis, heart problems, and depression.

The patient was diagnosed with hepatitis C while he lived in California.  The patient has not had a biopsy or undergone any therapy for his hepatitis C.

The patient was diagnosed with chronic obstructive pulmonary disease and has received pulmonary function tests in the past. He did smoke 2 to 3 packs per day for 30 years and has now decreased this to 2 to 3 cigarettes a day for the last  to 2 years. . . .  Also contributing to his pulmonary disease, the patient had a crush injury in 1990.  The patient was crushed by a truck.  This broke numerous ribs and produced bilateral pneumothorax [collapsed lung]. . . .

The patient states that he may have had a myocardial infarction [heart attack] in California years ago and this was mild.  The patient has no further details. . . .

For the patient's depression, he does make use of Prozac and Seroquel management and these do help him.  The patient does not see a psychiatrist. . . .

The patient states he has arthritis in his knees and his spine and additionally has a history of his left hand being broken with posttraumatic arthritis. . . .

PAST MEDICAL HISTORY:
1.      Gastroesophageal reflux disease.
2.      Hypothyroidism.

PAST SURGICAL HISTORY:
1.      Skin graft to the left hand after a gunshot wound as a child.
2.      Pin in the hand.
3.      History of surgery after 3 gunshot wounds to the bilateral lower extremities.

* * * * *

SOCIAL HISTORY:  The patient lives with his mother.  He is divorced.  He has no children.  The patient smokes 2 to 3 cigarettes a day now.  He denies any current alcohol use and denies illicit drug use.

* * * * *

REVIEW OF SYMPTOMS:  . . .  The patient has decreased hearing in his right ear secondary to explosive ordinance exposure in the army. . . .

PHYSICAL EXAMINATION:

VITAL SIGNS:  The patient's height is 69 inches, weight is 275 pounds. Blood pressure is 158/104. . . .

GENERAL OBSERVATION:  The patient is alert and oriented times 3 and in no apparent distress.  The patient is obese. The patient has a hoarse raspy voice.

* * * * *

LUNGS:  Clear to auscultation bilaterally.  No wheezes, rales, or rhonci.

HEART:  Regular rhythm without murmurs, rubs or gallops. . . .

EXTREMITIES:  . . .  The patient's left 3rd digit has 45 degrees of flexion.

SPINE:  The patient has normal station.  The patient had a wide-based antalgic gait.[23]  The patient ambulated from the waiting room to exam room (approximately 10 feet) without significant difficulty.  The patient was able to walk without an assistive device.  The patient was able to heel-to-toe walk as well as heel and toe walk.  The patient was able to squat halfway to the ground with mild difficulty.

NEUROLOGICAL:  . . .  The patient did not demonstrate any  muscle atrophy, spasm or tenderness.  The patient was able to communicate without difficulty and was appropriate throughout the examination. . . .

DIAGNOSES:
1.      Chronic obstructive pulmonary disease.
2.      Atypical chest pain.
3.      Depression.
4.      Posttraumatic arthritis of the left hand.
5.      Gastroesophageal reflux disease.
6.      Hypothyroidism.
7.      Tobacco abuse.
8.      Hypertension.
9.      Obesity.

IMPRESSION:  The patient provided good effort during the examination today.  The patient had no significant deficits of range of motion.  He had no to mild difficulty with orthopedic maneuvers and had good strength throughout.  Based on this, I feel the patient would be able to sit unrestricted.  The patient will be able to stand for 4 to 6 out of 8 hours and walk for 2 to 4 out of 8 hours.  The patient will be able to walk 300 feet before needing to rest.  The patient's one deficit of strength involves his left hand with history of traumatic injury.  The 3rd digit prevents him from making a full fist and also makes his grip strength 4+/5.  This would be a factor in his ability to lift and carry.  The patient

---

[23]A limp adopted so as to avoid pain.

would be expected to be able to lift and carry approximately 50 pounds occasionally and 25 ponds frequently.  The patient did have some fine motor deficits to his left hand including inability to make a fist.  The fingers could be opposed.  The patient had good dexterity in his other digits.  The patient does not require any devices for ambulation.  The patient would be able to communicate in the workplace as well as travel. . . .

The patient's left hand injury would prevent him from some manual tasks.  His pulmonary disease would limit his exertion in the workplace as well.  Smoking cessation and weight loss would be advised.

On June 19, 2006, plaintiff underwent pulmonary function tests at St. John's Hospital (Tr. at 203-207).  Plaintiff weighed 252 pounds on the day of testing.  His FEV1 was 3.15, or 82 percent of predicted, and his FVC was 4.21, or 89 percent of predicted.

On June 20, 2006, plaintiff saw Dr. Langguth with a chief complaint of "med refill" (Tr. at 214).  Plaintiff's blood pressure was 128/84, his weight was 252 pounds.  Dr. Langguth did not perform a physical exam.  He assessed esophageal reflux, hypothyroidism, backache, and depression.  He prescribed Trazodone (antidepressant) with five refills, and medication for acid reflux and thyroid hormone replacement.

On December 1, 2006, plaintiff saw Dr. John Bentley (apparently in Dr. Langguth's office) with a chief complaint of "refills" (Tr. at 212-213).  Plaintiff reported more back pain, feeling tired, anxiety, and depression.  He had no cardiovascular symptoms and no gastrointestinal symptoms.  Plaintiff's blood pressure was 144/94 and his weight was 248 pounds.  He was "healthy appearing".  His neck was normal, cardiovascular system was normal.  Plaintiff had tenderness in his back on palpation and rhonchi were heard in his lungs.  Dr. Bentley assessed bronchitis, esophageal reflux, arthritis, lumbago, and anxiety disorder not otherwise specified.  Plaintiff was told to "increase the Prozac to 40."

On May 11, 2007, plaintiff saw Dr. Langguth with a chief complaint of "DB six month checkup, med refills." (Tr. at 211). "Doing well (when he can afford meds). Needs refills." Plaintiff's blood pressure was 138/98, his weight was 225 pounds. His chest was normal, cardiovascular system was normal. Dr. Langguth assessed essential hypertension, hypothyroidism, depression, and primary insomnia. He told plaintiff to continue his current medications and follow up in six months. He prescribed Vicodine (narcotic) twice a day as needed for pain, with each prescription containing 60 pills and five refills; Seroquel (antipsychotic) with five refills; Trazodone (antidepressant) with five refills; and Prozac (antidepressant) with five refills. He also prescribed medication for hypertension, acid reflux, and thyroid hormone replacement.

On November 6, 2007, plaintiff saw Dr. Langguth with a chief complaint of "Med. refills" (Tr. at 209-210). "Is doing OK on current meds, but is still waiting to hear from SSI on possible hearing." Plaintiff's blood pressure was 130/94 and he weighed 224 pounds. His chest was normal, cardiovascular system was normal. Plaintiff's lower back exhibited tenderness on palpation of the left and right paraspinal region. Dr. Langguth assessed hypothroidism, backache, and depression and told plaintiff to continue his current medications. He told plaintiff to return in six months. Dr. Langguth prescribed Vicodin (narcotic) twice a day as needed for pain, with each prescription containing 60 pills and five refills. He prescribed Seroquel (antispychotic) with five refills, and Trazodone (antidepressant) with five refills. He did not refill plaintiff's Prozac. The other refills were for acid reflux and thyroid hormone replacement.

On May 2, 2008, Dr. Langguth wrote a letter to whom it may concern which stated in its entirety: "John Fuqua is considered to be permanently disabled and unable to work. This

determination was established by the Social Security Administration. If you have any questions, you may call our office [phone number]." Although the salutation was "To whom it may concern", the letter was addressed to Ursula Mathis in Buffalo, Missouri (Tr. at 222). Dr. Langguth had not seen plaintiff for the past six months.

On July 30, 2008, Dr. Langguth completed a Medical Source Statement Physical (Tr. at 315-316). He had not seen plaintiff in approximately nine months. He found that plaintiff could frequently lift less than five pounds, occasionally lift up to five pounds, stand or walk for less than 15 minutes at a time, stand or walk for a total of two hours per day, sit continuously for 30 minutes at a time, and sit for a total of four hours per day. He found that plaintiff was limited in his ability to push or pull with his legs due to lower back pain. He found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. He found that plaintiff could occasionally reach, handle, finger, and feel. He found that plaintiff could frequently see, speak, and hear. He found that plaintiff should avoid any exposure to extreme cold or heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights. He was asked whether plaintiff needed to lie down or recline to alleviate symptoms, and he checked "unknown." He was asked whether plaintiff's pain or medication caused a decrease in concentration, persistence, or pace. He checked "yes" and wrote "pain meds, other psych meds all can lead to decreased concentration [illegible]." The form asks the doctor to circle the factors relied upon, and Dr. Langguth circled all of them:

(1)     Medical history;

(2)     Clinical findings (such as the result of physical or mental status examinations);

(3)     Laboratory findings (such as blood pressure, x-rays);

(4)     Diagnosis (statement of disease or injury base[d] on its signs and symptoms);

(5)     Treatment prescribed with response, and prognosis.

## C.     *SUMMARY OF TESTIMONY*

During the August 5, 2008, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

### 1.     **Plaintiff's testimony.**

At the time of the hearing, plaintiff had lived in his residence for five years (Tr. at 25). Plaintiff lived alone; and his brother, who suffers from Huntington's Disease, lived next door in a mobile home (Tr. at 25). The brother was not in a wheelchair at the time, but plaintiff speculated that he would need to go into managed care sometime that year due to his deteriorating condition (Tr. at 25). The brother had had the disease for about five or six years and started receiving Social Security disability benefits three or four years ago (Tr. at 25-26). Plaintiff prepared dinner for his brother every night, consisting of pizzas or pot pies (Tr. at 25).

Plaintiff has not been able to get Medicaid and does not have medical insurance (Tr. at 26). His mother pays for his medical care and his medicine (Tr. at 26). Plaintiff's mother owns plaintiff's residence and has been paying all of his bills for the past five or six years (Tr. at 26). Plaintiff's mother is 76 years of age, and plaintiff does not feel good about having his mother take care of him (Tr. at 41).

Plaintiff was 50 years of age at the time of the hearing (Tr. at 26). He has a tenth grade education and has a GED (Tr. at 26). Plaintiff worked as a plumber from 1993 to 1995 and left that job to start his own business doing yard work, household repairs, etc. (Tr. at 27). The business did not work out (Tr. at 27). Plaintiff worked for a landscape company for six to eight

months in 1998 but left that job because he could not keep up due to his lung problems (Tr. at 27-28). In 1991 plaintiff had a four-wheel-drive truck "roll up" his chest and broke all his ribs (Tr. at 28). His lungs collapsed twice (Tr. at 28).

Since the truck incident, plaintiff has worked for some temporary agencies and he had a couple customers for several years for whom he performed yard and tree trimming work (Tr. at 28). He also painted and he installed sprinkler systems (Tr. at 28). Plaintiff last worked in that capacity five or six years earlier (Tr. at 28). Plaintiff moved from California to Missouri at that time and has not been able to do much of anything since then (Tr. at 28-29).

Plaintiff takes 13 different medications, including an inhaler (Tr. at 36). He uses an inhaler four times per day for emphysema (Tr. at 36). Plaintiff takes sleeping medication around 8:00 or 9:00, then he worries about his bills and his brother, and he finally goes to bed around midnight (Tr. at 36-37). He then stays "knocked out" until around noon the next day and he remains groggy during the day (Tr. at 37). Some of his medicine causes him to have problems with focusing and concentrating (Tr. at 40, 42). After plaintiff gets up around noon, he spends most of the rest of his day sitting in a recliner watching television (Tr. at 40, 46). Besides taking his brother a plate of food every night, plaintiff spends the rest of his day lying down or reclining (Tr at 41). This is mainly because of back pain (Tr. at 41). If plaintiff tries to bend down to pick something up, his back hurts (Tr. at 41). Plaintiff's medication causes him to have a dry mouth and he has to drink water frequently (Tr. at 47).

Plaintiff's heart flutters and "acts silly" when he is just sitting inside the house (Tr. at 37). He has reached for the phone several times to call 911, but he does not want a big bill (Tr. at 37). Plaintiff has Hepatitis C, but he cannot get the interferon treatment because that requires

insurance or a lot of money (Tr. at 37). He is not being treated for Hepatitis C (Tr. at 37). Plaintiff's liver hurts sometimes; and a lot of the time he feels sick like he has the flu, which he thinks may be caused by his Hepatitis C (Tr. at 37).

Plaintiff suffers from depression because he can no longer work, he cannot do much, and he is watching his little brother die (Tr. at 38). Plaintiff does not talk to anyone but his brother anymore, and he has become a hermit (Tr. at 38). He gets nervous in shopping centers -- just goes in to get what he needs and leaves -- and he does not socialize much anymore (Tr. at 38). Plaintiff does not think he could perform a job in customer service because his voice is very soft due to the truck incident in 1991 (Tr. at 38-39). Plaintiff cannot hear out of his right ear due to an incident when he was in the Army (Tr. at 42).

Plaintiff has arthritis in his back and neck, and his knees creak, crack, hurt, and get stiff (Tr. at 39). After plaintiff takes his pain medication, his joint pain is about a five or six on a scale of one to ten (Tr. at 39-40). The middle finger on plaintiff's left hand does not bend all the way due to having been broken several times (Tr. at 47). Plaintiff cannot use his finger like he used to, but it does not cause pain (Tr. at 48). Plaintiff is right-handed (Tr. at 48).

Plaintiff believes he cannot work mainly due to his breathing problems and his heart problems (Tr. at 29). Plaintiff has emphysema, but he has not been able to afford a specialist (Tr. at 29). He sees Dr. Langguth for most of his treatment (Tr. at 29). However, he cannot afford all of the treatment; for example, he was supposed to get a colonoscopy but could not afford it (Tr. at 29). If plaintiff goes out to get the mail, he "gags" and cannot breathe (Tr. at 30). His mail box is about 50 yards away from the house (Tr. at 30). If plaintiff does anything for more than five or ten minutes, he is "hacking and hewing" and he has to sit down (Tr. at 31).

Plaintiff also has a productive cough and his heart beats "funny" (Tr. at 31, 44).

Plaintiff estimated that he could walk for less than 15 minutes; perhaps a couple hundred yards (Tr. at 31). Plaintiff could stand for an hour or two total in an eight-hour work day (Tr. at 32). Plaintiff has difficulty sitting due to arthritis in his spine, neck, and knees (Tr. at 32). His shoulders also bother him (Tr. at 32). He believes he could sit for about 30 minutes at a time and for a couple of hours total all day (Tr. at 32-33).

When plaintiff tries to carry groceries in from his truck, it takes him all day (Tr. at 33). Plaintiff believes he could frequently carry "less than five or ten pounds" (Tr. at 33). He could carry ten to 15 pounds on an occasional basis (Tr. at 33). Plaintiff hurts when it gets cold, and humidity knocks him down and he has to stay inside most of the day (Tr. at 34).

Plaintiff sometimes does not wash his dishes or vacuum (Tr. at 42). It took him two or three days to get his house ready for the Fourth of July when his neighbors and mother came over (Tr. at 42). He normally could have done it in three or four hours (Tr. at 43). Plaintiff can only stand to wash dishes for ten to 15 minutes before his back starts hurting (Tr. at 43). He has difficulty vacuuming because of his back and his breathing (Tr. at 43). Plaintiff "huffs and puffs" and he gets tunnel vision (Tr. at 44).

Plaintiff's attorney asked plaintiff the following questions about his ability to work:

Q.     Okay, do you think you'd have any difficulty going back to a job where you had to be outside the majority of the time?

A.     I can't work. I mean I've never had a sit-down job.

Q.     What about --

A.     I've always used my hands.

Q.      Would you have any difficulty with outside work?. . . Work where you were outdoors?

A.      I've worked outdoors all my life.

Q.      Do you think you'd have any difficulty now returning back to a job where you had to be outdoors?

A.      Yeah, I couldn't.

Q.      Why couldn't you?

A.      Well, my breathing, my heart rate, you know, my heart and --

Q.      Do you have any difficulties with the heat?

A.      Yes.

Q.      As far -- besides your breathing?

A.      Well, I sweat pretty bad.

Q.      Okay, and --

A.      If I was working outside, my back also, lower back, it just -- I can't swing a pick no more.

Q.      What if I found you a sit-down job where you were on your feet but two hours out of the day and you didn't have to lift but 10 pounds max? Do you think you'd have any difficulty with a full-time job where you sat the majority of your workday five days a week?

A.      I can't imagine a sit-down job. I've never done anything like that.

Q.      Why not, sir?

A.      Well, it's -- I didn't get a lot of schooling, and I've worked outside all my life.

Q.      Do you think you'd have any difficulty with a full-time, sit-down job?

A.      Yeah, I can't imagine it. I mean doing what?

Q.      Do you think you'd have any difficulties physically performing the duties?

A.       I don't think so.

Q.       You don't think you'd have any difficulty?

A.       No, I don't think I'd be able to do it --

Q.       Because?

A.       -- for any length of time. I don't know. It just -- I'm trying to figure out what kind of job, but I don't know.

Q.       Okay.

A.       I mean I've never -- I've always worked with my hands and my body outside. . .

(Tr. at 34-36).

When plaintiff starts huffing and puffing, he gets lightheaded and tunnel vision, and he coughs (Tr. at 44). Once or twice a week, he gets coughing spells so bad that he almost passes out (Tr. at 44).

Plaintiff has a drivers license and a truck (Tr. at 45). Plaintiff's truck is a utility truck that gets about four miles to a gallon, so he only drives it to the store and back for groceries (Tr. at 45). Plaintiff does his own laundry, but a neighbor cuts his grass for him (Tr. at 46). When plaintiff first moved in, he mowed his own grass, but after plaintiff's lawnmower broke his neighbor started doing it for him (Tr. at 46). "I keep telling him you don't need to do that" (Tr. at 46).

**2.      Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge.

The first hypothetical included a person with the limitations described by plaintiff during his hearing testimony (Tr. at 49). The vocational expert testified that because of the need to rest

all day, the person would not be able to work (Tr. at 49).

The second hypothetical assumed a person with the limitations as listed by Dr. Steven Langguth in the July 30, 2008, Medical Source Statement (Tr. at 314-316) to which the vocational expert stated the person could not work because the restrictions included a less-than-sedentary residual functional capacity, an inability to complete an eight-hour work day, and postural and manipulative limitations that would preclude even sedentary unskilled work (Tr. at 49-50).

The third hypothetical included a person who could stand for six hours per day; walk for four hours per day; sit without limitation; lift and carry 20 pounds occasionally and ten pounds frequently; could occasionally push and pull with the arms, kneel, crouch, or crawl; could not perform fine finger dexterity with the left non-dominant hand; and should avoid extreme temperature, humidity, extreme dust, fumes, and poor ventilation (Tr. at 50). The vocational expert testified that the person could not perform plaintiff's past relevant work, but could perform light unskilled work such as ticket taker, DOT 344.667-010, with tens of thousands of positions in the United States, or counter clerk, DOT 249.366-010, with hundreds to thousands of positions in Missouri and tens of thousands in the United States (Tr. at 50-51). Both of these positions require only occasional fingering (Tr. at 51). The counter clerk position requires occasional handling, but the ticket taker position requires frequent handling (Tr. at 51). There is no forceful gripping in either job (Tr. at 51).

This third hypothetical person with the ability to only occasionally grip, handle, and finger with the left hand could work as a furniture rental consultant, DOT 295.357-018 with hundreds to thousands in Missouri and tens of thousands in the United States (Tr. at 51).

The fourth hypothetical involved the person in the third hypothetical but with an inability to do customer service or to work with the general public and who must have only limited interaction with coworkers as far as speaking is concerned due to problems with more than occasionally using his voice (Tr. at 52). The vocational expert testified that such a person could not work because of the inability to perform customer service (Tr. at 52).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge David Fromme entered his opinion on August 27, 2008 (Tr. at 8-18).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 10).

Step two.  Plaintiff suffers from chronic obstructive pulmonary disease, hypertension, and obesity, severe impairments (Tr. at 10).  Plaintiff's mental impairment is not severe (Tr. at 0-11).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11).

Step four.  Plaintiff's complaints of disabling pain are not credible (Tr. at 14-16). Plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand six hours per day; walk four hours per day; sit without limitation; occasionally crouch, kneel, crawl, use his upper extremities to push or pull, and grip, handle, or finger with his left hand; cannot perform fine finger movements with his left hand; and should avoid exposure to extreme temperatures, humidity, dust, fumes, and poor ventilation (Tr. at 12). "[T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."

(Tr. at 12).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 16).

Step five.  Plaintiff can make a successful adjustment to other work that exists in significant numbers in the national economy (Tr. at 5).  Examples are ticket taker, with hundreds of jobs in Missouri and more than 10,000 nationally; counter clerk, with thousands of jobs in Missouri and over 100,000 in the country; and furniture rental agent, with thousands of jobs in Missouri and more than 100,000 in the country (Tr. at 17).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the

basis of objective medical evidence or personal observations by the ALJ.  In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and examining physicians relating to such

matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms;

precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and

functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social

Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion,

and additionally states that the following factors should be considered:  Treatment, other than

medication, the individual receives or has received for relief of pain or other symptoms; and any

measures other than treatment the individual uses or has used to relieve pain or other symptoms

(e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a

board).

     The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of

disability are as follows:

> . . .  The claimant's self-reported activities of daily living are inconsistent with such
> allegations of totally debilitating symptomatology.  The claimant testified that he watches
> television, takes food to his brother each evening, occasionally does housework, and does
> laundry.  The claimant reported in the Function Report - Adult that he feeds his cat;
> occasionally takes out the trash and cuts grass with a riding lawnmower, prepares simple
> snacks, occasionally grocery shops; watches television; and is independent for all self-
> care.
>
> The claimant reported in the Function Report - Adult that his mother cooked for him and
> he was only able to fix snacks for himself, yet, he testified that he cares for his brother
> and cooks dinner for him every night.  The claimant has alleged performing few, if any,
> household chores; yet it is noted that the claimant lives alone and has not reported any
> particular help in maintaining the residence.

A review of the claimant's work history shows that the claimant worked only sporadically with periods of little or no substantial earnings prior to the alleged disability onset date. Moreover, the claimant's work record fails to establish that he left the work force solely because of his impairments, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. The claimant's work record draws into question the claimant's motivation to work and his credibility as a witness herein.

. . . The claimant alleges that he is disabled; however, the paucity of medical evidence since February 14, 2006, suggests that the claimant was not seeking nor receiving treatment for any alleged impairment. . . .

The claimant testified he has a cardiac condition, which is not supported by the medical evidence. He told Roy V. Ditchey, M.D., that he had a myocardial infarction in 1993. However, Dr. Ditchey noted the claimant was not certain where he was evaluated for his reported heart attack in Sacramento and records were not available. Dr. Ditchey added the [sic] he was skeptical the claimant actually had a heart attack. The claimant also testified he has hepatitis C; however, Dr. Langguth, his treating physician, has never addressed any hepatitis issue in his treatment notes.

Dr. Lewis noted the claimant had no-to-mild difficulty with orthopedic maneuvers and demonstrated good strength throughout the examination.

. . . The undersigned notes the claimant has not been prescribed pain modalities such as a TENS unit, a back brace, or an assistive device for ambulation, and he has never been referred by a physician to a pain management clinic notwithstanding his complaints of debilitating pain. Finally, he has not required aggressive medical treatment, frequent hospital confinement, or surgical intervention.

The clinical and objective findings herein are inconsistent with allegations of total debilitation. The record is devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, an indication that claimant continues to move about on a fairly regular basis. Moreover, there is no diagnostic evidence to substantiate the claimant's complaints of debilitating pain.

(Tr. at 14-16).

## 1.    PRIOR WORK RECORD

The ALJ noted that plaintiff has a poor work record. There are many years prior to his alleged onset of disability when plaintiff had no earnings. His lifetime earnings, over a period of

26 years (all before his alleged onset date) total $60,707.22 which is an average of $2,334.89 earned per year.  Plaintiff stopped working four years before his alleged onset of disability (Tr. at 139), and he left jobs for reasons unrelated to his condition.  After his alleged onset date, plaintiff did not work (at least part of the time) because he was incarcerated.

On April 24, 2003 -- almost four and a half years after plaintiff said he stopped working -- he saw Dr. Demoraes who said plaintiff was there "for work release so he doesn't have to work."  It is unclear what work plaintiff was trying to avoid due to his longstanding unemployment, at least as far as reported earnings go.  Dr. Demoraes filled out the paperwork so that plaintiff could get food stamps for the next six months.

Plaintiff's employment history shows an inability to stay at one job for any length of time.  He earned a total of $56 at Estates Landscaping, $101.12 at AM West Ventures, $199 at Roseville Personnel Services, $200 a Sierra Sunrise Construction, $503.63 at Interim Personnel, $548 at Justin Framing, and the list goes on.  Plaintiff essentially has a lifetime of either not working at all or working at a job for a short period of time before either quitting or being terminated for whatever reason.

Plaintiff's work history strongly supports the ALJ's finding that plaintiff's allegations of not working due to disability are not credible.

## 2.       DAILY ACTIVITIES

The ALJ pointed out that plaintiff's self-reported activities of daily living were inconsistent with his allegations of total disability.  Some of the daily activities are hardly indicative of an ability to work:  watching television, feeding the cat, preparing simple snacks. However, as the ALJ pointed out, plaintiff is able to live alone, he reported no problems with self

care, he can mow his yard with a riding lawnmower, he can shop for groceries, he can do housework and laundry. Plaintiff testified that he does not drive very often because his truck only gets about four miles to a gallon of gas, not because his impairments prevent him from driving. He testified that his neighbor started cutting plaintiff's grass because plaintiff's lawnmower broke, not because plaintiff was no longer able to do it himself.

## 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

The evidence in the record establishes that the duration, frequency, and intensity of plaintiff's symptoms were not indicative of total disability.

In his administrative paperwork, plaintiff was asked to circle all of the activities that are affected by his condition. He did not circle sitting, understanding, following instructions, or getting along with others. Yet, he testified at the hearing that he could sit for only 30 minutes at a time and for a couple of hours total all day. He testified at the hearing that he has trouble focusing and concentrating even though understanding and following instructions were not problems when he filled out his administrative paperwork. Plaintiff argues in his brief that he cannot do customer service work because of an inability to talk; however, in the administrative paperwork plaintiff did not allege disability due to any problems with his voice.

Plaintiff alleges that he gets short of breath, that he "hacks, hews, gags, and cannot breathe" after walking 50 yards to his mail box. However, in May 2005 Dr. Mauldin observed that when plaintiff walked about a block briskly, he acted short of breath but his pulse, blood pressure, and oxygen level (by pulse oximetry) all remained unchanged. Additionally, plaintiff continued to smoke during all the years he was diagnosed with emphysema and chronic obstructive pulmonary disease.

44

Plaintiff testified that he suffers from liver pain due to hepatitis C; however, he has never been treated for hepatitis C and he has never complained of liver pain to his treating doctors. When he was first diagnosed, he was told to go watch a video about his condition, but he failed to attend or call to cancel the appointment (Tr. at 258). Plaintiff testified that he could not get interferon treatment due to lack of money and no insurance; however, no doctor ever suggested that plaintiff be treated with interferon.

Plaintiff claims he suffers from a heart condition and relies in part on his possible heart attack in 1992. However, his cardiologist, Dr. Ditchey, commented that plaintiff "subsequently generally did well and was physically active without cardiac symptoms" (Tr. at 292-294); therefore, it is really irrelevant whether plaintiff actually suffered a heart attack or something else in 1992.

On May 6, 2003, plaintiff saw cardiologist Roy Ditchey. After that he went over five and a half months with no medical treatment. Plaintiff had an MRI on March 4, 2004, and then went over eight months before seeking any additional medical treatment. In June 2006, he saw Dr. Langguth for medication refills, and did not return for another six months. At that time, his chief complaint was "refills". He waited another five months after that to see a doctor and on that visit, his chief complaint was "DB six month checkup, med refills." He was told to return in six months, which he did and his chief complaint on the next visit was "med refills." After each visit over the last couple years plaintiff was treated by Dr. Langguth, the doctor told him to return in six months; there is no evidence that he was avoiding medical care due to finances.

There are several references in the record to plaintiff being out of his medication. However, during those same times, plaintiff continued to smoke cigarettes, apparently choosing

to spend whatever money he had on cigarettes instead of medicine.

In January 2005, plaintiff told his doctor that he was "feeling OK". In November 2005, he said he was having "no new problems" (he had reported emphysema and joint pain) and he was told to continue his same medications.

Beginning in June 2006 and from there after, plaintiff's chief complaint every time he went to the doctor was "need medication refills".

This factor supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## *4.* *PRECIPITATING AND AGGRAVATING FACTORS*

Many of plaintiff's worst symptoms are caused and continue to be aggravated by his continued smoking. Plaintiff testified that the main reason he is unable to work is due to his breathing problems and heart problems, both of which are exacerbated by smoking.

Plaintiff's anxiety and depression were noted as having been caused by his "tons of family problems". Plaintiff told Dr. Davis that he had been feeling more anxious and nervous over the past several months and that he was paranoid and feeling especially paranoid about cops. Dr. Davis wondered if it was secondary to schizophrenia; however, at that time, defendant had just spent the last six months in jail. Because Dr. Davis did not have any notation of this in his record, it is at least somewhat questionable as to whether he would have attributed plaintiff's recent paranoia about police officers to schizophrenia as opposed to his recent arrest and incarceration. In any event, no other doctor ever diagnosed plaintiff with schizophrenia or questioned whether plaintiff may have that condition, and he was never treated for schizophrenia.

46

There is little evidence that any potential job-related activities precipitate or aggravate plaintiff's symptoms.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

In his Function Report, plaintiff said he sleeps 11 to 13 hours per day, but in the same report he said he suffers from insomnia.

On plaintiff's second visit at the Shasta Community Health Center, he asked for Vicodin (a narcotic). At that time, he saw Dr. Hall who wrote, "no narcotics" and prescribed a non-steroidal anti-inflammatory. Less than a month later, he returned to the Shasta Community Health Center and saw Dr. Demoraes who agreed to prescribe Vicodin. (In Missouri, plaintiff saw Dr. Davis and on the first visit again requested a prescription for Vicodin.)

In April 2003, plaintiff was reported as doing better with his anxiety, depression, and insomnia. Dr. Demoraes wrote, "The patient seems a great deal calmer to me but he says he thinks he is only a little bit better." In March 2004, Dr. Davis noted that Ultram was moderately helpful with plaintiff's back pain. Plaintiff's pulmonary function was greatly improved with his inhalers (from an estimated lung age of 83.7 to an estimated lung age of 67.4 years) despite his continued smoking. In January 2006, Dr. Langguth described plaintiff as "doing well." In May 2006, plaintiff told Dr. Lewis that his medication helped him manage his depression. In May 2007 he reported that he was doing well when he could afford his medication. In November 2007 he said he was doing well on his current medications.

There are very few references to changes in plaintiff's medication. For the last few years of his treatment with Dr. Langguth, the doctor refilled plaintiff's medications (unchanged) and told him to come back in six months after each visit, an indication that plaintiff's symptoms were

adequately controlled with that medication.

Plaintiff testified that his medication causes him to have problems with focusing and concentrating, and that they cause him to have a dry mouth. However, plaintiff never reported these side effects to any doctor. Plaintiff testified that he had not been able to afford to see any specialists or "all of the treatment". However, there is no indication in the medical records of doctors recommending any treatment that plaintiff did not receive or any specialists that he did not see. In fact, the example given by plaintiff was that he was supposed to get a colonoscopy but could not afford one. A colonoscopy is unrelated to any of the impairments plaintiff claims cause his inability to work.

This factor supports the ALJ's credibility determination.

## 6.   *FUNCTIONAL RESTRICTIONS*

No doctor ever placed any restrictions on any of plaintiff's activities. In October 2003 his gait was observed by a doctor at the Buffalo Medical Center to be normal. In November 2004, his exam was normal. In January 2005 plaintiff's lungs were normal, his breathing was normal, his heart sounds were normal, his extremities were normal. In March 2005, plaintiff's eyes, ears, neck, respiratory effort, lung sounds, and heart were all normal. In May 2005 plaintiff's judgment, insight, mood, effect, heart, and lungs were all normal with the exception of moderate decreased breath sounds toward the bases. Later that month, his cardiac exam was normal, his lungs were clear, his speech was normal except he spoke in a whisper, his bones and joints were normal, his extremities were normal except his left middle finger. No functional impairment was discovered; however, the examining doctor found evidence of embellishment. In April 2006, Dr. Aram found that plaintiff's mental impairment was not severe. In May 2006,

48

Dr. Lewis observed that plaintiff ambulated from the waiting room to the exam room without significant difficulty and was able to heel-toe walk as well as heel-to-toe walk. However, plaintiff's gait was a "wide-based antalgic" gait. Plaintiff had no significant deficits of range of motion, essentially no difficulty with orthopedic maneuvers, and good strength throughout. The doctor found that plaintiff could sit without limitations, stand for four to six hours, walk for two to four hours, lift and carry 50 pounds occasionally and 25 pounds frequently, and communicate within the workplace. In December 2006, plaintiff's neck and cardiovascular system were normal. He was observed to be "healthy appearing."

This factor supports the ALJ's credibility determination.

**B. *CREDIBILITY CONCLUSION***

In addition to the above factors, I note that plaintiff told Dr. Lewis that he had smoked two to three packs of cigarettes for the past 30 years; however, he told other doctors that he had smoked one pack a day for 30 years. In any event, plaintiff has continued smoking despite his emphysema, chronic obstructive pulmonary disease, and heart issues. Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997); 20 C.F.R. § 416.930(b).

Finally, when plaintiff was asked at the hearing why he would not be able to do a sit-down type job, his only answer was that he had always worked outside with his hands and could not imagine doing an indoor job.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII.    FINDING AT STEP TWO

Plaintiff argues that the ALJ erred in finding that plaintiff's depression, anxiety, and right knee pain were not severe impairments.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)    Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by his depression, anxiety, or right knee pain.

## A.     DEPRESSION/ANXIETY

The evidence supports the ALJ's finding that plaintiff's depression and anxiety did not significantly limit his ability to understand, carry out, or remember simple instructions; to use judgment; to respond appropriately to supervision, co-workers, and usual work situations; or to deal with changes in a routine work setting.

In his Function Report dated February 27, 2006, plaintiff indicated that he is able to finish what he starts.  In the same form, he circled "completing tasks" as something with which he has difficulty.  Obviously this is inconsistent.  In the same report, plaintiff indicated that he had no difficulty with getting along with family, friends, neighbors, or supervisors and could follow spoken instructions.

In January 2004, Dr. Davis, a treating physician, observed plaintiff to be alert and oriented, his judgment and insight were appropriate, and his mood and effect were stable.  He was assessed with mild to moderate depression.

In May 2005, Dr. Davis observed that plaintiff was alert and oriented, his judgment and insight were appropriate, his mood and effect were stable.  Although Dr. Davis indicated plaintiff's recent paranoia about police may be secondary to schizophrenia, it is unclear whether Dr. Davis was aware that plaintiff had been arrested and had spent the past six months in jail. Later that same month, a physician with the Department of Social Services gave a secondary diagnosis of anxiety and depression, but found that plaintiff did not have a mental disability.  In April 2006, Dr. Aram found that plaintiff's mental impairment is not severe; that he had no

restriction of activities of daily living; only mild difficulties in maintaining social functioning; only mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

In May 2006 plaintiff was examined by Dr. Lewis who noted that plaintiff's medication helped manage his depression, and that he had not been seeing a psychiatrist. In November 2007, plaintiff's treating physician, Dr. Langguth, refilled plaintiff's Seroquel and Trazodone but did not refill his Prozac despite diagnosing depression. He told plaintiff to come back in six months, which is an indication that he believed plaintiff's symptoms were adequately controlled on the prescribed medication.

During the administrative hearing, plaintiff testified that he believed he was unable to work "mainly due to his breathing problems and heart problems." Although plaintiff testified that he no longer talks to anyone but his brother and has become a hermit, he later testified about how long it took him to prepare for a holiday gathering during which his neighbors came over.

Plaintiff never sought or received counseling, nor did any of his doctors ever suggest counseling, hospitalization, or any treatment other than maintenance drugs. The absence of any evidence of ongoing counseling or psychiatric treatment or deterioration in a claimant's mental capabilities "disfavors a finding of disability." Roberts v. Apfel, 222 466, 469 (8th Cir. 2000).

Plaintiff argues that the ALJ should have ordered a consultative examination. An ALJ should order a consultative mental examination if the medical records do not contain sufficient medical evidence to determine whether the claimant is mentally disabled. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. § 416.919a(b). Just because a claimant is taking antidepressants, an ALJ is not required to order a consultative mental exam. Hensley v.

Barnhart, 352 F.3d 353, 357 (8th Cir. 2003).

In this case, there is evidence that plaintiff complained of feeling depressed fairly regularly for years. However, during that time plaintiff was prescribed medication which was rarely changed, the dosages remained the same for the most part, plaintiff's treating doctors repeatedly noted that his medication was helping his depression, no doctor ever recommended any treatment that plaintiff was unable to afford, no doctor ever recommended counseling, and plaintiff never sought out or inquired about any mental health treatment other than medication refills. Therefore I find that the ALJ did not err in failing to order a consultative mental exam.

Based on the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's mental impairment was not severe.

## B.    *RIGHT KNEE PAIN*

 In a Disability Report, plaintiff said that the conditions which limit his ability to work are Hepatitis C, emphysema, arthritis, heart problems, and depression. He at that time did not believe that he was limited by his right knee pain. During the administrative hearing, plaintiff testified that he was unable to work mainly due to his breathing problems and his heart problems.

In April 2003, plaintiff reported pain in his shoulders, back, and neck, but he did not report knee pain. In March 2004, he told Dr. Davis that he twisted his knee about a week earlier and had been experiencing right knee pain and swelling. On exam, the knee demonstrated some minimal tenderness and swelling, but the ligaments were intact. Plaintiff was told to take Ibuprofen. He was already taking Ultram for back pain, but Dr. Davis did not adjust the dosage at all due to plaintiff's right knee pain, despite plaintiff having been experiencing the pain for the

past week while already on Ultram.

Plaintiff had an MRI of his knee at Dr. Davis's suggestion.  Dr. Hall assessed water on the knee, a somewhat dislocated knee cap, and an otherwise negative exam with no internal abnormality.  Plaintiff did not seek any medical care for the next eight months after that MRI, which suggests the treatment (Ibuprofen) was working adequately to control his knee pain.

In May 2005 a Department of Social Services physician observed normal joints and extremities.  He found no physical disability.

There are no other complaints of knee pain or treatment for knee pain in the medical records.

Based on the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's right knee pain is not a severe impairment.

## VIII.    OPINION OF DR. LANGGUTH

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of plaintiff's treating physician, Dr. Langguth, who gave the following opinion in a Medical Source Statement dated July 30, 2008:  He found that plaintiff could frequently lift less than five pounds, occasionally lift up to five pounds, stand or walk for less than 15 minutes at a time, stand or walk for a total of two hours per day, sit continuously for 30 minutes at a time, and sit for a total of four hours per day.  He found that plaintiff was limited in his ability to push or pull with his legs due to lower back pain.  He found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl.  He found that plaintiff could occasionally reach, handle, finger, and feel.  He found that plaintiff could frequently see, speak, and hear.  He found that plaintiff should avoid any exposure to extreme cold or heat, weather, wetness, humidity, dust, fumes, vibration,

hazards, and heights.  He was asked whether plaintiff needed to lie down or recline to alleviate symptoms, and he checked "unknown."  He was asked whether plaintiff's pain or medication caused a decrease in concentration, persistence, or pace.  He checked "yes" and wrote "pain meds, other psych meds all can lead to decreased concentration [illegible]."

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

Clearly the most important factors here, as discussed by the ALJ, are the supportability by medical signs and laboratory findings and the consistency of the opinion with the record as a whole.  The only abilities that are relevant to this discussion are plaintiff's ability to lift, stand, walk, sit, crouch, and stoop, because all none of the other abilities which are in dispute (between the findings of Dr. Langguth and the ALJ) are relevant to the position of furniture rental consultant which the ALJ found plaintiff could perform.

The furniture rental consultant position requires that the person be able to perform light work,[24] lift 20 pounds occasionally and ten pounds frequently, and occasionally stoop and crouch. The ALJ found that plaintiff has the ability to do these things; Dr. Langguth found that plaintiff could lift only five pounds occasionally and less than five pounds frequently, stand or walk for a total of two hours per day, sit for a total of four hours per day, and never crouch or stoop.

The first observation is a glaring inconsistency in Dr. Langguth's Medical Source Statement -- he found that plaintiff could walk, stand, and sit for a combined total of six hours per day. However, when asked if plaintiff needed to recline or lie down during the day, he said he did not know. It is unclear exactly what Dr. Langguth envisioned plaintiff doing for the rest of the day if he could only sit, stand, or walk for a combined six hours each day and perhaps did not need to lie down or recline.

Dr. Langguth's records rarely reflected physical exams, and when they did the exams were essentially normal. On August 19, 2005, no exam was noted and the diagnosis was two words long and illegible. On September 3, 2005, Dr. Langguth changed one anti-inflammatory for another and kept all other medications the same. On October 28, 2005, plaintiff said he had new pain in his spine. Dr. Langguth prescribed a muscle relaxer and kept the other medications the same. On November 21, 2005, he told plaintiff to continue his current medications. On

---

[24]According to the Dictionary of Occupational Titles, work is considered light (1) when it requires walking or standing to a significant degree, or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls, and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

January 17, 2006, Dr. Langguth noted that plaintiff was doing well. He continued him on the same medications and told him to come back in three months. On March 31, 2006, no exam was done. Dr. Langguth continued plaintiff on his same medications and added aspirin and a muscle relaxer although plaintiff's chief complaint had been "needs refills." On June 20, 2006, Dr. Langguth did not perform a physical exam. He refilled plaintiff's medication. Five months passed and then plaintiff returned to Dr. Langguth's office and saw Dr. Bentley who increased plaintiff's Prozac after plaintiff said he had been feeling tired, depressed, and anxious. Five more months passed and plaintiff saw Dr. Langguth. It had been 11 months since Dr. Langguth had seen plaintiff. He noted that plaintiff was doing well and needed refills. The exam that was performed was normal. He told plaintiff to continue his current medications and come back in six months. On November 6, 2007, Dr. Langguth noted that plaintiff was doing OK on his current medications. He told plaintiff to continue on those medications and come back in six months.

On May 2, 2008, Dr. Langguth wrote a letter to whom it may concern stating that plaintiff was permanently disabled, and that this determination was "established by the Social Security Administration." Clearly this information was not accurate, and it is curious as to why Dr. Langguth would write such a letter, which was addressed to Ursula Mathis in Buffalo, Missouri. At this time, Dr. Langguth had seen plaintiff only four times in the past 26 months, and on each of those visits he had commented that plaintiff was doing fine. He had not seen plaintiff for the past five months. On July 30, 2008, he completed the instant Medical Source Statement. At that time, he had not seen plaintiff for almost nine months.

At no time during any of plaintiff's visits to Dr. Langguth did he complain of difficulty walking, standing, sitting, lifting, crouching, or stooping. At no time during his treatment of plaintiff did Dr. Langguth recommend that plaintiff limit his walking, standing, sitting, lifting, crouching, or stooping.

In his Function Report, plaintiff indicated that he did not have any difficulty sitting. This is inconsistent with Dr. Langguth's finding that plaintiff could sit for a total of only four hours per day. Plaintiff testified that he could carry ten to 15 pounds occasionally. This is inconsistent with Dr. Langguth's finding that plaintiff could occasionally carry no more than five pounds.

Finally, although Dr. Langguth wrote that plaintiff's medication could lead to decreased concentration, his records never reflected that plaintiff complained of decreased concentration during all the years he was treated by Dr. Langguth.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit the opinion of Dr. Langguth as reflected in the Medical Source Statement.

## IX.    *SEVERE AND NON-SEVERE IMPAIRMENTS IN COMBINATION*

Finally, plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity without providing sufficient limitations for plaintiff's chronic obstructive pulmonary disease and difficulty speaking, and he did not consider the severe obesity in combination with plaintiff's right knee impairment.

With respect to plaintiff's chronic obstructive pulmonary disease, his continued smoking is grounds for denying benefits. Medical records reflect that smoking likely caused plaintiff's emphysema and COPD, and his continued smoking amounts to a failure to follow a prescribed

58

course of remedial treatment.  Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008); Kisling v.

Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (noting that a failure to follow prescribed treatment

may be grounds for denying an application for benefits). "This is not a case in which the

correlation between claimant's smoking and claimant's impairment is not readily apparent. To the

contrary, there is no dispute that smoking has a direct impact on [the claimant's] pulmonary

impairments."  Id. (internal citation omitted).

   With respect to plaintiff's difficulty speaking, the record establishes that although

plaintiff had a hoarse voice, he was able to communicate just fine.  In his Disability Report,

plaintiff did not list his voice as an impediment to working.  He testified that he could not work

mainly due to his breathing problems and heart problems, not due to an inability to speak.

Plaintiff's need to drink water during the hearing was due to a dry mouth caused by his

medication (a side effect that was never reported to any doctor), not due to his hoarse voice.

Although the Missouri Department of Social Services doctor noted that plaintiff spoke in a

whisper, he did not find that plaintiff suffered from any disability, mental or physical.  Dr. Lewis

noted that plaintiff spoke in a hoarse raspy voice, but found that plaintiff was able to

communicate without difficulty and that he would be able to communicate in the workplace.

Finally, even plaintiff's longtime treating physician Dr. Langguth found that plaintiff could

frequently speak.

   Plaintiff argues that the ALJ erred in failing to consider plaintiff's the affects of

plaintiff's obesity on his residual functional capacity.

   Social Security Ruling 02-01p, Evaluation of Obesity, includes the following:

The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs [body mass index] of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

In addition, although there is often a significant correlation between BMI and excess body fat, this is not always the case. The Clinical Guidelines also provide for considering whether an individual of a given height and weight has excess body fat when determining whether he or she has obesity. Thus, it is possible for someone whose BMI is below 30 to have obesity if too large a percentage of the weight is from fat. Likewise, someone with a BMI above 30 may not have obesity if a large percentage of the weight is from muscle. However, in most cases, the BMI will show whether the individual has obesity. It also will usually be evident from the information in the case record whether the individual should not be found to have obesity, despite a BMI of 30.0 or above.

\* \* \* \* \*

Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. . . . Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea.

The fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments. It means that they are at greater than average risk for developing the other impairments.

Plaintiff points out that he "weighed approximately 275 pounds and measured at 69

inches.  This corresponds to a body mass index of approximately 40."

Plaintiff did, at one time, weigh 275 pounds.  However, it was for a very short time.

Below is a list of the weights recorded in plaintiff's medical records:

| Date | Weight |
|------|--------|
| January 22, 2003 | 176 pounds |
| April 7, 2003 | 185 pounds |
| April 14, 2003 | 189 pounds |
| May 19, 2005 | 229 pounds |
| March 31, 2006 | 257 pounds |

|                    |            |
|--------------------|------------|
| May 12, 2006       | 275 pounds |
| June 20, 2006      | 252 pounds |
| December 1, 2006   | 248 pounds |
| May 11, 2007       | 225 pounds |
| November  6, 2007  | 224 pounds |

Plaintiff weighed 257 pounds on March 31, 2006; he gained 18 pounds in approximately six weeks to reach his highest weight of 275 pounds on May 12, 2006; then over the next five weeks he lost 23 pounds which put him back down to 252 pounds.  By a year later, he had reduced his weight to 225 pounds -- 50 pounds lighter than his highest weight, and he remained at that weight through at least the rest of 2007, which is the latest weight recorded in the medical records.

Plaintiff's body mass index at 225 pounds is 33.2, which is slightly above the obese mark of 30.  This is a Level I obesity rating, rather than the Level III rating argued by plaintiff.  Even at 250 pounds, which plaintiff weighed for about nine months of 2006, his body mass index would be 36.9, or Level II.

Considering plaintiff's obesity combined with his right knee pain does not lead to a conclusion that plaintiff's abilities are diminished.  As was discussed above, plaintiff rarely complained of knee problems to his doctors, and plaintiff's treating physicians did not recommend that he lose weight.  In fact, the only doctor to recommend that plaintiff lose weight was Dr. Lewis, who examined plaintiff in connection with his disability application on May 12, 2006, the only time when plaintiff weighed 275 (his highest weight).  This suggests that plaintiff's obesity was not causing plaintiff significant problems.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment with regard to plaintiff's COPD, voice, and obesity.

X.    *CONCLUSION*

Based on all of the above, I find that the substantial evidence in the record as a whole support the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


            /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 30, 2010